JOSÉ ÁNGEL RUBERT ARMSTRONG ET AL., Plaintiffs and Appellees, *v.* THE COMMONWEALTH OF PUERTO RICO, Defendant and Appellant.

No. R-65-110.          Decided June 27, 1969.

574

576

J. B. Fernández Badillo, Solicitor General, J. F. Rodríguez Rivera, Acting Solicitor General, for appellant. Juan Enrique Géigel, Guillermo Silva, Hernán G. Pesquera, and M. A. Giménez Muñoz for appellees.

Second Division composed of Mr. Justice Hernández Matos, as Chief Judge of Division, Mr. Justice Santana Becerra, Mr. Justice Dávila, and Mr. Justice Torres Rigual.

Mr. Justice Santana Becerra delivered the opinion of the Court.

Plaintiffs-appellees filed a complaint against the Commonwealth of Puerto Rico to revendicate two land properties which were described thus in the complaint:

"Parcel No. 10—Principal (1) RURAL: Estate situate in Monacillos ward, of Río Piedras, municipal jurisdiction of San Juan, comprising six cuerdas and eight hundred and ninety-six thousandths of a cuerda (6.896 cds.), equivalent to two hectares, seventy-one (71) ares, and five hundred and ninety-five (595) centiares, bounded on the NORTH by the 'old Puerto Nuevo River; on the SOUTH, by the new Puerto Nuevo River; and on the EAST and WEST, by the old Puerto Nuevo River.'"

"Parcel No. 10—Principal (2) RURAL. Estate situate in Monacillos ward, Río Piedras, municipal jurisdiction of San Juan, comprising one hundred and twenty cuerdas and forty-eight hundredths of a cuerda (120.48 cds.) equivalent to forty-seven (47) hectares, thirty-five (35) ares, thirty-two (32) centiares, and fifty-four (54) milliares, bounded on the NORTH by the new Puerto Nuevo River; on the SOUTH, by lands of the principal estate, San Patricio; on the EAST, by the new Puerto Nuevo River and lands of the principal estate, San Patricio; and on the WEST, by the Barraco Brook."

By Joint Resolution No. 13 of March 13, 1956, the Commonwealth of Puerto Rico consented to be sued in this case with respect to the revendication of the parcels previously described, which were described in an identical manner in said Joint Resolution.

For all the purposes of this litigation Parcel No. 10 has been a sole body of 129.74 cuerdas demarcated in the Plan of the Mangrove Lands of the People of Puerto Rico at the Bay of San Juan, officially drawn by the Government of Puerto Rico on December 4, 1919. See said Parcel in ANNEX-A, which is a photographic copy of a part of said official Plan. The Government of the United States segregated from this body 2.29 acres which constitute a passage within the Parcel, joining points 636 and 695 in said ANNEX, dividing it into Parcel No. 10 Principal (1) and Parcel No. 10 Principal (2), with the descriptions given in the complaint, and the total area reduced from 129.74 to 127.376 cuerdas. This segregation is not in litigation.

After a trial on the merits, in which numerous documentary evidence was presented, complemented by testimony of witnesses of both parties, and after an ocular inspection was performed, the San Juan Part of the Superior Court rendered judgment on May 11, 1965, decreeing that the plaintiffs are the legitimate owners of Parcel No. 10 in litigation, Principal (1) and Principal (2); ordering the cancellation of the title over said parcel, recorded in favor of the Commonwealth in

the Registry of Property and ordering the cessation of any intervention of the State with respect to the property against plaintiffs.

*History of plaintiffs' title in controversy*

(1) On December 17, 1881 Antonio Ramos Mencos filed a possessory title proceeding before the judge of the Municipal Court of Río Piedras, where he stated being owner of the property known as Hacienda San Patricio at the Ward Monacillos of Río Piedras, composed of approximately 760 cuerdas of land in one body, bounded on the north by the Río Piedras River which goes across the property known as "Puerto Nuevo"; on the west by the Margarita brook, the Estate (*Sucesión*) of Ramón Arroyo and the Presbyter Manuel Díaz Caneja; on the south by Gerónimo Landrau; on the east by Landrau and the aforementioned river; and it is composed of flat and semiflat lands and forests, having the buildings which are described. He said he had acquired said property by inheritance from his father Antonio Ramos Sandoval, at the death of the latter on February 6, 1854, since which date he has possessed it as owner, without interruption from anybody.[1]

A certification from the Mayor, the Trustee, and the Secretary of the Municipality of Río Piedras was attached to the document for the purpose of establishing that pursuant to the municipal archives, Antonio Ramos Mencos was the owner of the property San Patricio, of 760 cuerdas as described, and that he paid the taxes corresponding to the same in his own name.

The information having been admitted, the owners of the adjacent properties were summoned and heard and they did not object to the possessory title proceeding, although the

---

[1] The Río Piedras river and the Puerto Nuevo river which will be mentioned so many times is the same river.

neighboring owner, Rev. Manuel Díaz Caneja, stated that even though he was not opposed, it should be understood that his boundary with Ramos was "the channel (*caño*) of the Margarita brook following the course up to two masonry pillars in a straight line to the ditch of said brook and not where the waters run today."[2]

The witnesses having been heard, who declared that the petitioner had been in possession of said property as owner since he inherited it in 1854, the Municipal Judge found proven the possession of the property in favor of Ramos since he inherited it in the year 1854, without prejudice to third party, and ordered the recording in his favor in the Registry of Property pursuant to the provisions of the Mortgage Law, recording verified on January 4, 1882 at folio 176, volume 26 of Río Piedras, property No. 89, first entry. (Plaintiffs' Exh. 1.)

(2) By deed No. 534 of July 12, 1893, executed before Notary Mauricio Guerra-Mondragón, Antonio Ramos Mencos sold the property San Patricio to Leopoldo Cerecedo. The same was described insofar as the area of 760 cuerdas and the boundaries are concerned in the same manner as it was described in the possessory title proceeding although now the following, more detailed description was added:

"The points and boundary lines of the described property are the following. 'Beginning at the mouth of the Río Piedras River there is located the channel of the Margarita Brook, and from this point upstream until it meets the old Guainabo Road, where the properties "Puerto Nuevo" and "Pueblo Viejo arriba" are adjacent: from this point in a straight line to the Head of the basin called "Barraco" and from here on downstream until it meets the point or corner of a palisade of *emajagua* which runs across until it meets the aforementioned "Margarita" Brook and

---

[2] This allegation of the neighboring Reverend resulted later in a suit between the Heirs of Ramos and him, which ended by judgment of this Court of June 29, 1906. *Estate of Ramos* v. *Díaz Caneja*, 11 P.R.R. 202 (1906).

from there downstream to the mouth of the river from where it started.' "

An identical detailed description of the San Patricio property was made in the public deed executed before Notary Francisco Acosta on November 28, 1815, by virtue of which Antonio Ramos Sandoval, father and predecessor in title of the vendor Antonio Ramos Mencos, acquired the Hacienda San Patricio from the widow of Colonel Jaime O'Daly, and where it was stated that the property was bounded on the north and east by the Puerto Nuevo River and on the west by Margarita Brook up to its mouth.

ANNEX-B is a drawing of the San Patricio property according to these boundary lines, and along which the waters of Margarita Brook flowed in 1885 when the litigation about its unstable course arose, finally decided in 11 P.R.R. 202 (1906).

The parties stated that the 80 cuerdas which were in litigation with Reverend Díaz Caneja were eliminated from the sale, for which reason the difference of approximately 680 cuerdas was conveyed to Cerecedo. This conveyance was also recorded in the Registry of Property in favor of the vendee Cerecedo, 13th entry of property No. 89. (Plaintiffs' Exh. 2; Exh. 15.)

(3) At the request of its owner, Cerecedo Hnos., on July 20, 1901 engineer Camilo González performed a survey of the San Patricio property acquired by them from Ramos. According to the survey certification and to the drawing drawn on the same date, the Hacienda San Patricio is bounded on the north by the Río Piedras River and Pablo Ubarri; on the south by lands belonging to Gerónimo Landrau; on the east by Landrau and the Río Piedras River and on the west by the *Barraco Brook*, lands belonging to the Heirs of Arroyo, and lands belonging to Heirs of Ramos, which are in litigation with Reverend Díaz Caneja. This survey revealed an area of 776 cuerdas within the described boundaries of which

BAHIA DE SAN JUAN

RIO PUERTO NUEVO

BAYAMON A SANTURCE

CAÑO UBARRI

PARCELA #10
AREA: 50 Hs. 99 As. Y 14 Cs.
= 129.74 CUERDAS.
PUEBLO DE PUERTO RICO

PARCELA NO. 11
AREA: 45 Hs. 94 As. Y 84 Cs. =
116.96 CUERDAS DE
PUEBLO DE PUERTO RICO

PARCELA #12

LUIS LLORENS TORRES

ARRIARTE HERMANOS

43.13 CDAS.

SUCN. RAMOS

QUEB. BARRACO

LUIS RUBERT

SAN PATRICIO

ANNEX "A"

FINCA LAS MONJAS

PABLO UBARRI

RIO DE RIO PIEDRAS O PUERTO NUEVO

BAHIA DE SAN JUAN

RIO DE RIO PIEDRAS

CARR. EN PROYECTO 775 M.

260 MS.

CAÑO CARBONERO

HOY IRIARTE HERMANOS

CAÑO CENTRAL

CAÑO MARGARITA

LA CANTERA DE LA HOY DE CABIERTO POR RAIMAT

CAMINO A SANTURCE

397 CDAS.

SUPERFICIE

Seboruco del REY

CAÑO SEBORUCO del REY

CAÑO ARTIFICIAL abierto por PRESBITERO CONEJA

HOY MANUEL DIAZ CANEVA

QUEBRADA

CARR. MARGARITA

QUEB. MARGARITA

PALENQUE MAJAGUA

QUEB. DE LAS YAGUAZAS

DIVISORIA DE LLORENS Y RUBERT

QUEB. BARRACA (antes BARRACA)

SUPERFICIE DE LLORENS Y RUBERT

CAMINO AL MUELLE

NACIMIENTO DE AGUA

NACIM. de AGUA

GERONIMO LANDRAU

A.R.R. CO.

CAMINO A PUEBLO VIEJO

MONTE

680 CDAS.

SEBORUCOS DE MALA TIERRA

HOY JOSE S. ARROYO CESTERO

NACIMIENTO DE AGUA

NACIMIENTO DE AGUA

N

PLANO TOTAL HACIENDA
"SAN PATRICIO"
"COMPUESTA: DE 1077 CDS." (680 CDAS DE DON
LUIS RUBERT Y 397 CDS DE DN. LUIS LLORENS TORRES
RADICADA EN EL BO. MONACILLOS de RIO PIEDRAS.
ESCALA: 1:5.000 MS.

ANNEX "B"

64 cuerdas were forests; 26 cuerdas of underbrush; 38 cuerdas of mangrove lands; 64 cuerdas of swampy lands; 86 cuerdas of flat lands; 100 cuerdas semiflat lands; 390 cuerdas of pasture, plus an area equivalent to 8 cuerdas which was occupied by the railway.

ANNEX-C[3] is the Drawing drawn by engineer González, by virtue of this survey. (Plaintiffs' Exhs. 4 and 5.) According to the table of dimensions of points, angles, distances, directions, and stations, together with the survey certification, the same began at point 1 within a circle; from there towards the northeast to point 2, railway bridge; from there towards the northwest following the course downstream to point 3, flowing of the Barraco Brook into the river; from there upstream by the course of this brook towards the south to point 4 and from there to the starting point 1.

(4) By deed of Sale No. 45 executed in Barcelona on January 17, 1916 before Notary Melchor Canal Soler, Luis Rubert Cátala, predecessor in title of plaintiffs, acquired from one of the successors in interest of Leopoldo Cerecedó the San Patricio property with an area of 680 cuerdas described in the same manner as in the preceding documents and in the Registry. This acquisition was likewise recorded under property No. 89. (Plaintiffs' Exh. 3.)

(5) On September 20, 1919, Rubert and the Heirs of Ramos, co-owners of the San Patricio property, requested in the Municipal Court of Río Piedras to change the possessory title of the property recorded in 1882 in favor of Antonio Ramos to one in fee simple. They stated that even though in said possessory title proceeding the property described was given an area of 760 cuerdas more or less, the same was erroneous, and that once the survey was performed by competent

---

[3] COMPILER'S NOTE: Annex "C" is not printed—"Drawing of the San Patricio Property which belongs to Cerecedo Hermanos & Cía., located at Monacillos Ward, in the jurisdiction of Río Piedras"—for failure to obtain a proper copy for its reproduction. Said Annex may be examined in the record of the case at the office of the Clerk of the Supreme Court.

surveyors and adequate devices, it proved to have within the aforementioned boundary lines and points, an area of 900 cuerdas, the excess of 140 cuerdas being less than a sixth of the recorded area. After the proper proceedings were followed with the publication of the corresponding edicts, on October 28, 1919 the Municipal Court rendered judgment ordering the change in ownership of the property originally recorded in favor of Ramos with the corrected area of 900 cuerdas. (Plaintiffs' Exh. 8.)

(6) By deed of Partition No. 32 executed before Notary Luis Abella Blanco on September 27, 1919, Luis Rubert Cátala and the successors in interest of Antonio Ramos who died on January 14, 1894, appeared and they stated that although in the possessory title proceeding prosecuted by Ramos the property was given an area of 760 cuerdas more or less, a survey performed by competent surveyors with adequate devices revealed that within the boundary lines described in said proceeding the property had an area of 900 cuerdas. They referred to the sale performed by Ramos in favor of Cerecedo conveying 680 cuerdas in favor of the latter, the vendor reserving for himself 80 cuerdas more or less which were in litigation. This remnant according to the survey of the entire property proved to be of approximately 220 cuerdas of flat and swampy lands; that by deed No. 670 executed before Notary Mauricio Guerra on June 10, 1894, the heirs, successors in interest of Antonio Ramos, took possession of the remainder of the said property which was not sold to Cerecedo; that consequently the Hacienda San Patricio belonged as of the date of this document to Luis Rubert Cátala and to the heirs of Ramos, the remainder of approximately 220 cuerdas belonging to the heirs of Ramos; that by notarial error and by error of the Registry when the sale by Ramos to Cerecedo was performed by deed No. 534 of July 12, 1893, it was not indicated that the part sold was a segregation from the entire property, nor was a demarcation

and description made, so that it could be recorded as a separate property in the Registry of Property, the sale being recorded under the same number 89 without segregating the property as well as successive conveyances; that in order to correct said errors the parties demarcated both parts to form separate properties, describing the part sold to Cerecedo, now Rubert, in the following manner:

"RURAL property known as 'San Patricio' situate in the ward of Monacillos of the Municipal District of Río Piedras, comprising six hundred eighty cuerdas, equivalent to two hundred sixty-seven hectares with twenty-six ares and sixty-five centiares of flat, semiflat, forests, swampy, and mangrove lands; bounded, on the North, by the Río Piedras River which crosses 'Puerto Nuevo', on the West by the rest of the main property belonging to the heirs of Ramos Buist and by the estate (*sucesión*) of Ramón Gutiérrez del Arroyo (today lands of José S. Cestero); on the South by Jerónimo Landrau; and on the East by the said Landrau and Río Piedras River; said property containing a dwelling house whose second story is made of wood and the first story of masonry, a kiln house, shedhouses, and several houses for the peones."

and describing the part belonging to the Heirs of Ramos in the following manner:

"RURAL property known as 'Monterrey' situate in the ward Monacillos in the Municipal District of Río Piedras, comprising approximately two hundred twenty cuerdas, equivalent to eighty-six hectares with forty-six ares and eighty-six centiares of flat, swampy, and mangrove lands; bounded on the North by the Río Piedras River; on the West by the Margarita Brook which separates it from the lands of the Presbyter Manuel Díaz Caneja (today property of the Iriarte brothers); on the East, by the segregated property of Luis Rubert; and on the South, by the same segregated property and by the lands of the heirs of Ramón Gutiérrez del Arroyo (today property of José S. Cestero); said property containing a shed or milking parlor and several small houses for the peones."

In the same document Rubert agreed to a pending sale of the part belonging to the Ramos to Luis Llorens Torres,

waiving any preferred right to which he might be entitled as successor of Cerecedo by virtue of a preference clause set forth in the latter's title. The parties expressly agreed that if as a consequence of the mangrove lands which the Commonwealth of Puerto Rico claims or for any other reason the total area of the principal property which has been divided would result smaller, the loss or reduction which might result would not affect in the least the parcel segregated as Hacienda *San Patricio* belonging to Rubert, but that said loss or reduction would be imputed to and would affect only the *Monterrey* property belonging to the Ramos, as would any excess if there were any.

Notice was entered in the Registry of Property of all the provisions in the aforementioned document of the increase in the area from 760 to 900 cuerdas in its totality, and of the increase from 80 to 220 cuerdas in the Monterrey portion of the Ramos, the San Patricio portion being recorded as a separate property at folio 182 of volume 46 of Río Piedras, property No. 2034, first entry, and the remnant belonging to the Ramos being recorded under the original number 89 of the property. (Plaintiffs' Exh. 7.)

(7) By deed No. 20 about Determination of Boundaries executed on July 3, 1922, before Notary Luis Abella Blanco, Rubert Cátala and Luis Llorens Torres, now owner of the 220 cuerdas of the Monterrey portion, stated that their respective properties, Monterrey and San Patricio, are adjacent among themselves (see Plaintiffs' Exh. 7) and the parties have respected the "Barraco" Brook because of the course it has in the drawing of July 19, 1901, ANNEX-C, as dividing line; and that in order to determine definitively the boundaries and to compromise any difference or excess of land there might be, they agreed that the "Barraco" Brook was definitively the dividing line between their properties and the boundary on the west of the San Patricio portion belonging to Rubert; that all the land to the east of said brook belonged to Rubert ex-

clusively; and to the west of the exclusive property of Llorens; that Llorens granted and conveyed herein to Rubert, any land to the east of the brook in excess of the recorded 680 cuerdas of Rubert, and Llorens was still owner of 220. This conveyance was made for the sum of $3,000 which Llorens received from Rubert at once, and thus any controversy about the west boundary of San Patricio and any excess in area was settled between them. Entry of the foregoing was made in the Registry of Property, at the margin of the respective properties No. 89, Monterrey; and No. 2034, San Patricio. (Plaintiffs' Exh. 9.)

In a letter of June 19, 1922 sent by Llorens to Rubert in connection with the foregoing deed, Llorens informs Rubert that he will continue defending the lawsuit about the mangrove lands (*People of Puerto Rico* v. *Luis Llorens Torres*, Civil # 12685, revendication), and Rubert would pay him $300 for attorney's fees for said lawsuit. Rubert, by letter of the same date, agreed to pay half of the costs of said lawsuit. (Plaintiffs' Exh. 14.)

(8) By deed No. 21 explanatory of property description, executed on July 3, 1922 before Notary Luis Abella Blanco, Rubert Cátala described the property as it has been aforestated, but he stated that although the property appeared recorded with an area of 680 cuerdas, it appeared to have an actual area of 776 cuerdas as a result of the survey performed by engineer Camilo González according to the drawing (Plaintiffs' Exhs. 4 and 5) and requested that the area be corrected thus in the Registry of Property, which was done by the second entry of said property No. 2034. (Plaintiffs' Exh. 10.)

(9) Before the title of the San Patricio property, of which there is knowledge (deed of November 28, 1815), the existence of said property as such was known as it appears from the *Diario de Disposiciones y Órdenes del Brigadier Don Ramón de Castro, Gobernador Intendente y Capitán General de*

*Puerto Rico* in connection with the British attack, since April 17, 1797, when enemy boats were sighted. On the 18th it was stated: "News has reached us that an enemy party composed of twenty or thirty men had reached the place of Baña-caballos and that the adjoining sugar mills of José Giral and Jaime O'Daly situate in Puerto Nuevo and San Patricio has been sacked." Since 1780, in a report which the Governor submitted to the King of Spain the Hacienda San Patricio was identified with the Puerto Nuevo River. These historical facts identify the San Patricio property with the Puerto Nuevo River, which has always been its boundary on the north.

### *History of the title of the defendant Commonwealth of Puerto Rico*

(10) On April 8, 1913 the Department of the Interior sent a letter to Luis Rubert, as proxy of Cerecedo and lessee of his property, notifying him that they had decided to perform the demarcation of boundaries and the survey of the lands and mangroves belonging to the Insular Government around the San Juan Bay and for that reason they requested him to allow the employees of said Department to enter the San Patricio property in order to place flags on the hills and in the higher parts thereof as corners of the triangulation which would be used as basis for the survey. Rubert was asked for the titles of Cerecedo's property for study and it was announced that when the boundary with the property of Cerecedo would be determined he would be notified in time so that he would witness the survey.

On April 22, 1913, Rubert answered as Cerecedo's proxy stating that he was willing to provide the Government all the facilities for the demarcation of boundaries and for the survey, but that, for his protection, an employee of the Department and another designated by him should perform

the demarcation of the lands belonging to Cerecedo without prejudging the question of property.

On May 8, 1913, Rubert sent to the Department Cerecedo's title which was returned to him on the following May 16. The evidence does not show anything as to what happened subsequent to these letters, nor how the demarcation of boundaries and the survey was performed. (Defendant's Exh. E.)

(11) On May 28, 1918 the Governor of Puerto Rico issued the Administrative Bulletin No. 143, a Proclamation, declaring all the mangrove lands of the coast of the Island of Puerto Rico and of the adjacent small barren islands as insular forests belonging to the People of Puerto Rico, Proclamation issued under the authority of § 2 of Act No. 22 of November 22, 1917, "An Act to provide a Forest Service in Porto Rico." All the mangrove lands of the island of Puerto Rico were described in said Proclamation and insofar as this lawsuit is concerned a portion of 1003.61 cuerdas of mangrove land was included and described thus:

"Mangrove land of Punta de Cataño, Ensenada de Pueblo Viejo, Sabana-Hoyos, Caño San Fernando, Santa Catalina, Portuguez, Mouth of the Puerto Nuevo River, Caño Seboruco del Rey and the Margarita Brook. Bounded on the North by the bay of San Juan; South, lands belonging to Marcos T. Caneja, Eduardo González Caneja, and those belonging to the heirs of Ramos; East and West, mangrove lands." (Defendant's Exh. G.)

(12) Beyond question, the Official Plan of said Mangrove Lands of the Bay of San Juan of 1003.61 cuerdas (Defendant's Exh. C) to which we referred at the beginning, dated December 4, 1919, and of which ANNEX-A represents a part was drawn by the People of Puerto Rico as a result of the aforementioned survey and demarcation of boundaries and of the Proclamation. In this drawing, ANNEX-A, Parcel No. 10 in litigation is demarcated with an area of 129.74 cuerdas, with the Río Piedras River or Puerto Nuevo River on its north and with the Barraco brook on its west.

(13) On June 18, 1940, the then Commissioner of the Interior, José E. Colom, issued a certification addressed to the Registrar of Property requesting him to record in the name of the People of Puerto Rico several parcels, among them Parcel No. 10 in litigation herein, which was described with an area of 129.74 cuerdas, as low mangrove lands, and bounded on the north by the Puerto Nuevo River; on the south by lands of Luis Rubert and the Hacienda San Patricio; on the east by the Hacienda San Patricio; and on the west by a channel (*caño*) into which the brook known as "Barraco" empties and which brook separates the mangrove land property of the Heirs of Petra de la Torre, before Luis Llorens Torres. (Defendant's Exh. A.)

The authority invoked by the Commissioner of the Interior in his certification to request the recording in the Registry of Property of said parcel, and others, in favor of the People of Puerto Rico as demarcated in the Plan of 1919 was § 13 of the Organic Act of April 12, 1900 (Foraker Act) and the Act of the United States Congress, approved on July 1, 1902 entitled "An Act authorizing the President of the United States to reserve public lands and buildings in the Island of Porto Rico for public uses, and granting other public lands and buildings to the Government of Porto Rico." In that manner Parcel No. 10 was recorded for the first time in favor of the People of Puerto Rico at folio 64 of volume 140 of Río Piedras, property No. 6971, on June 25, 1940.

(14) On November 20, 1940 and by deed No. 16 executed before Notary R. B. Pérez Mercado, the People of Puerto Rico conveyed to the United States Parcel No. 10 together with other parcels demarcated in the aforementioned Plan of Mangrove Lands of 1919, and the United States recorded its title over the same. (Defendant's Exh. A-1.)

(15) On January 11, 1950, and by deed No. 1 of Segregation and Conveyance executed before Notary Francisco A.

Quirós Méndez, the United States of America conveyed again said Parcel No. 10, and some others, to the Government of Puerto Rico, subject to certain segregations made by the United States, among them the segregation of 2.29 acres within Parcel No. 10 which we mentioned at the beginning, at page 576. The Government of Puerto Rico recorded again its right over Parcel No. 10.

### Conformation of the properties in litigation

It arises from the foregoing that each party supports its proprietary right with respect to the property in litigation by a notarial title recorded in its favor without any limitation in the Registry of Property. In view of that situation it is necessary to determine, before entering into the consideration of the litigants' right, whether Parcel No. 10 and plaintiffs' property are congruent in all or part of their extension.

If the Drawing ANNEX-A is placed over the Drawings ANNEXES-B and C so that the course of the Puerto Nuevo River, the point where the Barraco brook empties into said river, and the course of the Barraco brook coincide in the three, it appears beyond any question that Parcel No. 10, as it appears demarcated in the Official Plan of December 4, 1919, occupies the polygon or northwestern part of the San Patricio property, the vertex of said polygon being the point where the Barraco brook empties into the river. There can be no doubt that Parcel No. 10 recorded in favor of the government is part, in all its extension, of the property San Patricio as the latter was acquired by Rubert, and after the segregation of the Monterrey portion which Ramos kept, with the Puerto Nuevo River as north boundary of both properties and the Barraco brook as the east boundary of Ramos and west of Rubert. We are constrained to conclude that Parcel No. 10 is, in all its extension, within the boundary lines already known since 1815 of the property San Patricio.

*The right of the parties to the property in litigation*

(1) *That of the plaintiffs-appellees*

The plaintiffs ground their proprietary right on the notarial titles recorded without defect in the Registry of Property and on the public ownership, quietly and peacefully enjoyed by them and their ancestors as owners.

In addition to their documentary evidence set forth above, the plaintiffs presented oral evidence. The testimony of Rafael Villamil, given at a prior lawsuit between the parties, was admitted by stipulation.[4] The witness testified that he took charge of the property San Patricio since August 10, 1927 as field superintendent and administrator; that the property was delivered to him by its points and boundaries; he described said boundaries in agreement with the documentary evidence; that the property was devoted to sugarcane and that he administered it until the year 1948 when it was sold to construct the Puerto Nuevo development. He stated that the part of the land in the patch between the Puerto Nuevo River and the Barraco brook was used as timber for the poles of the fences and the rest was pasture. That everything in that corner was useful. That he was not interrupted at any moment during the years he administered said property as to any portion. That nobody pretended to be owner of the property during that time and that he always was in possession of the same as Rubert's field superintendent. He testified that the northwest corner which was used to produce timber for the poles and for cattle grazing was the place where the mangrove land, the river, and the Barraco brook were located, the corner of the river with said brook; that that corner might have approximately 100 cuerdas and that it had a dry part of para grass. With a view to the Government's Plan, the northwest corner to which he referred coincided

---

[4] District Court of San Juan, Civil #7674.

with Parcel No. 10 in litigation. To the questions of the State:

"Q.—In that corner of the Puerto Nuevo River and the Barraco Brook, what kind of forest was there? A.—Mangrove land.

Q.—Those mangrove lands were they used for timber for poles? A.—Yes, sir.

Q.—Is the mangrove appropriate for poles? A.—Good enough for poles.

Q.—Poles for what? A.—For fences.

Q.—In what amount did you remove them? A.—Depends on the need there was.

Q.—Was that continuous? A.—Where there is sugarcane and cattle there is a constant repair of fences.

Q.—Of what was that fence made? A.—Of barbed wire.

Q.—And the poles were they made of wood? A.—Yes, sir.

Q.—Specifically, were the poles of mangrove? A.—Yes, sir.

Q.—Is that a common practice to make fences out of mangrove poles? A.—Yes, sir.

Q.—Did you use it for any other purpose besides poles? A.—As firewood, the squatters used it as firewood, for cooking.

Q.—What squatters? A.—Those of the property.

Q.—Are those mangroves in solid ground? A.—Yes, sir.

Q.—Can you walk around there? A.—In parts the feet get wet and in parts it is deeper or more even.

Q.—And when the tide rises? A.—In part it enters and in part it does not.

Q.—What part of that corner which you pointed out in the drawing was covered by the tide? A.—At the very corner it did not cover, but well inland the tide entered a little because the corner is high.

Q.—Was it high because of the configuration of the land or was it filled? A.—In part it was filled but all along the river bank it was high before being filled.

Q.—What cattle did you have under your administration? A.—Oxen, cows, and calves.

Q.—What pasture was there in that parcel? A.—In that part there was para grass.

Q.—Are you sure of that? A.—Sure.

Q.—Are you sure we are talking about the same parcel?
A.—Yes, sir.

Q.—About the parcel which is bounded by the river on the North and by the brook on the West? A.—In part there was para grass.

Q.—Is there para grass at present? In 1948 when you saw it for the last time? A.—I left in March 1948.

Q.—And was there para grass? A.—Yes, sir.

Q.—Cultivated or of the wild type? A.—Wild but good para grass.

Q.—The one who says they are swampy lands is that true? A.—There are swampy lands and para grass, but it is not general.

Q.—Going away[5] from the Puerto Nuevo River straight towards the south, where the swampy lands end what distance is there between the river and where the swampy lands end? A.—Towards the outside or from the river banks?

Q.—From the river inland towards the property. A.—I believe that there might be 150 or 200 meters.

Q.—You walk 200 meters? A.—To reach the river, from the river high up.

Q.—Do you have any idea of what a cuerda is? A.—Yes, certainly.

Q.—Have you made any survey? A.—Yes, I have made many surveys.

Q.—With engineer's chains? A.—And with sight rods.

Q.—How many cuerdas did San Patricio have? A.—I do not know exactly because I was not in charge of drawings. I think there were over 600 cuerdas; I do not know exactly.

Q.—Planted with sugarcane how many there were? A.—I had two joined sugar plantations and there were 600, 400, or 500 cuerdas.

Q.—Was there any other plantation besides these two? A.— San Patricio and Puerto Nuevo.

Q.—In San Patricio how many plantations did you have? A.—Only one.

Q.—Of how many cuerdas of sugarcane? A.—In San Patricio there were 350 or 400 cuerdas of sugarcane.

---

[5] EDITOR'S NOTE: In the Spanish text this footnote is an explanation of a misspelled word copied from the record.

Q.—And the rest? A.—Pasture, because we had many cattle.

Q.—From 350 to 400 cuerdas of sugarcane. How many cuerdas of swampy and mangrove lands were there at the property San Patricio? A.—More or less 80 or 100 cuerdas.

Q.—Are those mangroves situated in one place only of the property? A.—In a corner.

Q.—The one you are talking about? A.—Yes, sir.

Q.—You never saw anybody get into that property during the time when you were the administrator of it? A.—When the dredge straightened the river.

Q.—When was that? A.—I think it was about 1947; I am not sure.

Q.—But, before you handed it over? A.—Around 1946, a couple of years before.

Q.—Before you handed over? A.—Yes, sir.

Q.—Did you ever see Navy officers there? A.—Never.

Q.—Nor did you see Navy employees? A.—No, sir.

Q.—Nor did you see engineers performing surveys? A.—No, sir.

Q.—Only with the exception of the straightening of the river? A.—Yes, sir. From the Navy I have not seen anything.

Q.—Who straightened the river? A.—The people of the dredge; they told me that it was the Government, and as it was a thing which was beneficial always I notified my boss about it.

Q.—Who was your boss? A.—René Jiménez.

Q.—What was Jiménez' position? A.—It was there at the Mill, but he was my boss who came to the property.

Q.—Were you the administrator of San Patricio? A.—Field Superintendent.

Q.—You personally did not say anything to Rubert? A.—No, sir.

Q.—Nor did it occur to you that the people who brought the dredge did it because they thought they were owners? A.—First, they opened a channel and the river was quite blocked and it was beneficial.

Q.—Blocked with what? A.—With the soil the dredge was throwing.

Q.—With a mud wall? A.—No full of slush (bahote) and the drains were obstructed and when they were opened it was beneficial to me.

Q.—Was a ditch made there several years ago during your

employment in the property to drain the big property of San Patricio? A.—Yes, there was a drain.

Q.—Who made it? A.—The Army, it was not the Navy.

Q.—But you told me that no one. A.—They did it because I insisted with a lieutenant who was in charge of the matters concerning malaria and I succeeded in getting the ditch made.

Q.—Was it a special favor to you? A.—Yes, it was beneficial to the matter of malaria.

Q.—When you say that they straightened the river, did they change its course? A.—Yes, sir, from the San Patricio property there remained a cuerda alongside the Northern part of the river which was part of the property and I reported that to Rubert.

Q.—What used to be the San Patricio property? A.—Yes, the river went alongside a border of San Patricio.

Q.—Did that river always have its course well defined? Did you see it there? A.—It always had the same width; at the bends it was wider.

Q.—Did it overflow? A.—When the tide was high, yes.

Q.—Up to where did the tide reach? A.—It came in and receded again; it covered the sugarcane plantation; coming in and receding.

Q.—The tide, was it twice a day? A.—Two times during the twenty-four hours."

The witness Pedro Díaz Monroig, who testified for the plaintiffs, stated that he had been connected with the San Patricio property since the year 1912 when he came to work there as a laborer, and later as field superintendent. He was working there until they sold the property in 1947. He described the boundaries of the property coinciding with the documentary evidence. Referring to the section or corner formed by the Puerto Nuevo River and the Barraco Brook at its mouth, he stated that there was a part of wet land which the tide covered when it was high and from there the poles for fences were taken. When the tides were high they covered that wet part, but when they were not high you could walk thereby with shoes on. The rest of the property was used for sugarcane and cattle raising. Sugarcane was planted almost

up to the very mouth of the brook; about half a cuerda or one cuerda before reaching the Barraco Brook. In that corner the cows were put to graze.

To questions of the State he testified that the property was never occupied by the *"Navy"*. That the military government purchased from Rubert a part but that the Navy never occupied the property.

José Rubert Armstrong testified that he had been in charge of the property since 1927, and he explained that when the property was sold to Long for the Puerto Nuevo Development they found out that in the Registry part thereof, Parcel No. 10, appeared recorded in favor of the People of Puerto Rico. In order not to interrupt the transaction with Long they proceeded to segregate this part and sell the rest. The segregation was made by deed No. 1400 executed before Notary Juan Rodríguez de Jesús on December 19, 1947. (Plaintiffs' Exh. 11.) The witness testified that his father was not interrupted by the People of Puerto Rico in the possession of the property before 1947; that the Navy had never taken possession thereof and that it had requested permission to make a rectification of the channel. To the possession of the plaintiffs, publicly and peacefully enjoyed as owners is joined the possession in the same concept, after becoming dominion, credited by the courts in 1881 in favor of Ramos since 1854, and that of his predecessor in title.[6]

---

[6] On February 10, 1948, the plaintiffs filed a petition for injunction against the Commissioner of the Interior, Jorge J. Jiménez, alleging that he and Admiral Daniel Barbey had illegally and violently trespassed their property and had performed acts disturbing plaintiffs' possession. (District Court of San Juan, Civil No. 7674.) For the reasons stated in our decision of *Armstrong* v. *Comm'r of the Interior*, 74 P.R.R. 160 (1952), the petition for injunction did not prosper. But at the end we said: "If at this stage the plaintiffs can successfully file against the People of Puerto Rico a revendicatory action, a declaratory judgment or an action to cancel the title that the People of Puerto Rico obtained by virtue of dominion title proceedings is something that is not now before us and what is more none of our concern." (The People recorded it by a certification issued by the

(2) *That of defendant-appellant*

Defendant-appellant, the Commonwealth, seeks to support its proprietary right over Parcel No. 10 on the Treaty of Paris, in § 13 of the Foraker Act, in the Act of Congress of July 1, 1902, and in administrative decisions of the Spanish Government agencies.

By Article VIII of the Treaty of Paris of April 11, 1899, the Spanish Monarchy ceded in Puerto· Rico to the United States ". . . all the buildings, wharves, barracks, forts, structures, public highways·and other immovable property which, in conformity with law, belong to the public domain, and as such belong to the Crown of Spain."

In the Treaty it was immediately made clear, that the aforesaid cession to which the preceding paragraph refers "cannot in any respect impair the property or rights *which by law belong to the peaceful possession of property of all kinds*, of provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories renounced or ceded, *or of private individuals*, of whatsoever nationality such individuals may be." (Italics ours.) (L.P.R.A., vol. 1 at p. 20.) [7*]

Article 13 of the Foraker Act of April 12, 1900, 31 Stat. 80, provided that all the property which might have been acquired in Puerto Rico by the United States under the cession of Spain in the Treaty of Peace, "in any public bridges, road houses, water powers,. highways, unnavigable streams, and the beds thereof, subterranean waters, mines, or minerals under the surface of private lands, and all prop-

---

Commissioner of the Interior to the Registrar.)

Aside from what is copied above and the other considerations which were utilized to issue ·said decision, it does not appear from that case that the disturbing acts alleged occurred exactly at the place where Parcel No. 10, object of this action, was segregated.

[7*] EDITOR'S NOTE: We omit this footnote since its text appears in the above-copied citation.

erty which at the time of the cession belonged, under the laws of Spain then in force, to the various harbor-works boards of Puerto Rico, and *all the harbor shores*, docks, slips, and reclaimed lands, but not including harbor areas or navigable waters," were placed "under the *control*" of the government established by said Foraker Act to be "*administered* for the benefit of the People of Puerto Rico."

By the Act of Congress of July 1, 1902, the President was authorized to reserve, within one year after the approval of the Act, public lands and buildings belonging to the United States in the Island of Puerto Rico for military, naval, marine-hospital, lighthouse, post offices, customhouses, United States courts, and other public purposes, as the President might deem necessary, and all the public lands and buildings, not including harbor areas, navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in the island, and not so reserved according to said Act, were thereby granted to the Government of Puerto Rico to be held or disposed of for the use and benefit of the people of the Island, this grant being upon the express condition that the Government of Puerto Rico would release any claim or interest it may have in or upon the lands and buildings reserved by the President under the provisions of that Act. 32 Stat. p. 731.

The foregoing provisions of the Treaty of Paris, the Foraker Act, and the Act of 1902, which the State invokes in support of its proprietary right, make it necessary for us to consider which of the properties herein disputed belonged to the Crown of Spain susceptible of having been granted to the United States in 1899.

Referring to unused lands overseas, Alcubilla, 1 *Diccionario de la Administración Española* 861, 4th ed., states that the laws of Title XII, book IV of the *Recopilación de Indias*, about the distribution of lots and lands to the new settlers and the disposal of those not distributed or cultivated, provided

that by farming and stocking them with cattle, trees, etc., they would acquire *title* over the lands after four years of dwelling and labor, and that those not distributed, and where there was no concession, would be sold in an *auction by inch of candle*, giving them at quit-rent.

By Royal Grant of October 15, 1754, instructions were given for the sale and concession of the unappropriated lands. Alcubilla comments that abuses must have been committed in such an important matter since by Royal Decree of June 11, 1814, the Intendancy of Havana was in charge of seeing that the Laws of the Indies and the Royal Grant of 1754 were complied with *and that the owners who, according to them,* would have obtained the legal acquisition *were respected, "the judges not admitting the least petition of any corporation or people against those lands, which already segregated and surveyed, should be applied to their owner by virtue of title, grant, concession, or purchase."* (Italics ours.)

This Royal Order is of June 11, 1814, only one year before the sale, by the widow of O'Daly to Ramos Sandoval, father of Ramos Mencos of the San Patricio property, already known thus and located in that place since at least 1780.

By another Royal Order of July 16, 1819, after Ramos Sandoval's acquisition by title, rules to *respect as legitimate titles of ownership* the grants of land made by the *Cabildos* and *Ayuntamientos* up to 1729, and for want of another title *the prescription of 40 years* were informed to the Intendancy of the Army.

If an issue involving ownership would have arisen when this Royal Order of July 1819 was decreed, more than 40 years had already elapsed since the Ingenio San Patricio was a known property located in that place.

Royal Orders of 1834 and 1858 expressed themselves in the same sense of respecting and protecting the ownership of those who had lands.

The Act of May 16, 1835, proclaimed 20 years after Ramos Sandoval had acquired by written title from O'Daly, known as the Act of Unclaimed Property, copied in VI Scaevola [*Código Civil*] 527, 1891 ed., provided in its § 1 that the following movable personal property and real property, rights, and promises belonged to the State:

"First. Those which were *vacant* and *without known owner* and *not owned* by any individual or corporation whatsoever." (Italics ours.)

In its § 3 it decreed that "Those properties which are kept illegally or owned without any title, which could be claimed in agreement with common laws also belong to the State." And in § 4 it provides that "In this revendication *it is incumbent upon the State to prove* that the possessor or wrongful occupant is not the legitimate owner, *without the latter being compelled to the showing of titles* nor disturbed in the possession until they are defeated in trial." (Italics ours.)

If a controversy would have arisen between the Spanish State and the Ramos after the Act of 1835 over the title of the San Patricio property, the State would have had to be the claimant in ordinary proceeding as any other litigant, with the burden of proof to establish its right, without being able to compel the Ramos to show their titles.

Compare the foregoing with the mere Certification sent to the Registry in 1940 by the Commissioner of the Interior as the only notarial title to record Parcel No. 10 in favor of the State.

On April 17, 1884, after Antonio Ramos Mencos had recorded his title in the Registry of Property, the Royal Decree of that date was promulgated approving the "Regulations for the Concession of Unappropriated Lands in Puerto Rico."

Section 1 of said Regulations provided that all "*wastelands, soils, and grounds as have no legitimate private owner,*

or in other words, such as have *never* been conveyed to private individuals by gratuitous concession or by grant for a valuable consideration made by competent officials" shall be considered as unappropriated lands for the purposes of these regulations *and according to Law XIV, Title XII, Book IV of the Recopilación de Indias.* (Italics ours.)

In § 2 it was provided that, among others, persons who prove that they have acquired lands by title from a competent official and that they have complied with the requirements imposed on them shall be considered as owners for the purposes of the Regulations, "those who have no title but *prove that they have been in uninterrupted possession of said lands for twenty years, where the lands are under cultivation,* and for thirty years where they are *uncultivated,* shall also be considered as owners." (Italics ours.) Land was considered under cultivation by the Regulations if it had been cultivated for the last three years. Alcubilla, *op. cit.* at p. 865. The period of 40 years of the Royal Order of July 16, 1819, was reduced to 30.

If a conflict would have arisen between the Spanish State and Ramos pursuant to said Regulations governing Concessions, the situation was that when the same was effective in 1884 Ramos had already judicially verified before the Municipal Court of Río Piedras, and had recorded a public, peaceful possession as owner for 69 years, more than twice the period of 30 years now provided for.

In *The People* v. *Dimas,* 18 P.R.R. 1019 (1912), referring to said Regulations for the Concession of Unappropriated Lands, of April 17, 1884, we said, at pp. 1035, 1037, that when the defendant in that case, addressed himself to the Government, invoking said Regulations, he had not acquired, either, a title by prescription under the provisions thereof.

In *People* v. *Rojas,* 53 P.R.R. 115 (1938), we also referred to the aforementioned Regulations for Concession. At p. 124 we stated that it is of judicial notice that originally the

entire territory of the Island of Puerto Rico belonged to the Spanish Crown by reason of discovery and conquest, part of it gradually passing to private ownership by onerous or free grants made by the Central Government, by *amparo* title granted by the Board of Waste Lands, *"and by adverse possession which extinguished the dominion title,"* (italics ours) to conclude further on, at p. 129, that taking into consideration the facts proved, it was not "difficult to conclude *that when the change of sovereignty was effected in the Island, dominion title to the property claimed* in the complaint *had not become consolidated in the appellant.* In other words, *on that date* the appellant could not show a title gained *by possession* for *thirty* years or more." (Italics ours.)

We have cited the foregoing laws, Orders, and Decrees of the Spanish Government only as a legislative historical background to demonstrate the highly protective attitude of the Spanish Crown towards the occupants and owners of land, but not because the Regulations for Concession of 1884 are of direct applicability, since at the time of its proclamation the Hacienda San Patricio was not *waste or unappropriated* lands as they are defined therein, nor were they lands without known owners as stated therein.[8]

Neither was San Patricio, with its precise boundaries known at least since 1815 according to ANNEX-B, one of the properties expressly mentioned in Art. VIII of the Treaty of Paris which on December 10, 1898 when the Treaty was signed, passed to the United States, nor was it other immov-

---

[8] Among the Royal Orders aforementioned, that of October 15, 1754, ratified by that of June 11, 1814, when instructions about unappropriated lands and about the concession thereof were given, the Crown was still worried about the lands of the Indians and charged the judges and sub-delegates "to proceed with gentleness, temperance, and moderation with respect to the lands which the Indians owned and needed" upon complying with such orders; and by the Royal Order of March 1, 1834 "it was sought to choose means *to provide proprietary title* to the *possessors* of lands in the domain of the Indies, *in order that they could enjoy due security and confidence."* (Italics ours.)

able property which, pursuant to said Article, "in conformity with law" belonged at that time to the Spanish Crown.

Against what has been previously stated, the Commonwealth has set up nothing to destroy the notarial title and the Record in the Registry of the San Patricio property to alter its boundaries or location or to refute its possession, known in private hands for more than a century on December 10, 1898.

■ The position of the Commonwealth, and this is the essential ground of its alleged proprietary right, is that Parcel No. 10 in litigation is a property of public domain and use, of the category which is not subject to conveyance and private *possession*, on account of being of eminent public use by the nature of the same. Let us see:

Already in the Third Partida of King Alfonso the Learned, year 1256, it is distinguished between properties of public domain of the State and those of public use which are not alienable. Title XXVIII of said Partida begins: "A man obtains or loses the ownership of property not only by the decisions of judges, of which we have spoken in the preceding Title, but also in many other ways, which we shall show in the laws of this Title."

Law III: "The things which belong in common to the creatures of this world are the following, namely; the air, the rain-water, and the sea and its *shores*, for every living creature can use each of these things, according as it has need of them. For this reason every man can use the sea and its shore for fishing . . . and for doing everything there which he thinks may be to his advantage." (Italics ours.)

And Law VI: "Rivers, harbors, and public highways belong to all persons in common, *so that* parties from foreign countries can make use of them, just as those who live or dwell in the country where they are situated." (Italics ours.)

And Laws IX and X state respectively which are the

common properties of every City or Town and which everyone has a right to use and which are those included in the common property of a City or Town and which everyone has not the right to use. The concept of the difference between public property owned by the State and property of public use not subject to man's trade, more defined later on, begins to appear here.

Title XXIX of the Third Partida states that the wise men of the ancients designated certain periods of time by the lapse of which a man could lose or gain the ownership of property, and indicates the way in which a man, by lapse of time, can gain the property of another or lose his own. Thus:

Law VII: "Neither a square, a street, a road, a pasture, a common, *nor* any other place of this kind which is *for the general benefit* of a town, castle, or community, *can be* acquired by any man through lapse of time. But with regard to property of another nature . . . *even though it may belong* to the council of any city or town ownership of the same can be obtained after the period of forty years." (Italics ours.) Already the Partida itself advances the explanation of the reason for the difference between one kind of common property and another, and it states: "This is the rule for the reason that, although *it belongs* to all *in common*, all do not make use of it, as is the case with the other property aforesaid." (Italics ours.)

These concepts are brought into the Spanish Law of Waters on August 3, 1866, extended to Puerto Rico 5 days after by Royal Order of August 8, 1866. In its Art. 1 this Act provides that the following are of national domain and for public use:

"1st. The coasts or sea boundaries of the Spanish territory, with their works, inlets, coves, roadsteads, bays and harbors.

"2d. The littoral, or rather the maritime zone which encircles all the coasts, in all the width determined by international law.

[It refers to the limit of miles in the high seas internationally recognized.]

■ "3d. *The shores.* Shore is the area *washed* by the sea in its ebb and flow. Its *interior* or terrestrial limit is formed by the line up to the place where the highest or equinoctial tides reach. Where the tides are not perceptible the shore begins on the part of the land at the line where the waters reach in ordinary stormy weather." (Italics ours.)

Article 2 of said Act, which appears published in volume 96 of the *Colección Legislativa de España* 294, provides:

"*Estuaries* and *river mouths* are considered sea ports up to the place where coastwise and seagoing vessels which are engaged in maritime commerce move inland. Except for these cases, the river banks or margins *keep their special nature of fluvial,* even though they are washed by the *sea waters.*[9]

"Art. 3. The anchorages, shipyards, dockyards, navy yards, and other establishments devoted *exclusively* for the use of the navy are property of the State. The islands formed or which may be formed in the maritime zone, or in the estuaries and river mouths, considered as sea ports, pursuant to Article 2, are likewise property of the State. But if the islands would have resulted from the cutting off of a private property by a river, they shall continue belonging to the owners of the broken up property or properties.

"Art. 4. Lands which join seashores through accretion and detritus *which the sea may cause* are of public ownership. When they are no longer washed by sea waters, nor necessary for public usage, nor for the establishment of special industries, nor for the service of vigilance, the Government *will declare them property* of the owners of the adjacent properties to the increase of same." (Italics ours.)

In the extensive and profound study made by the Commission of 1859 which drafted the Law of Waters of 1866, and which constitutes its Statement of Motives—Alcubilla, *op. cit.* at p. 341—after stating that rules cannot be given about the utilization of public waters without setting up

---

[9] The Puerto Nuevo River is not navigable at any place.

accurate and precise rules, which so far had not been fixed in civil or administrative laws, by virtue of which waters belonging to public or private ownership would be perfectly *defined and marked off*, nor the *courses* or *banks* which should remain of public ownership could be indicated without delimiting them and separating them from those which belong to private ownership, the Commission says: (p. 344)

"The Commission has deemed, then, that they should abstain from fixing it, limiting themselves to declare that that territorial *maritime zone*, whatever the extension which the international law may grant it [it refers to the limit of miles in the high seas], belongs to the public ownership of the Nation, as well as the works, bays, roadsteads, coves, and inlets formed by the coasts of the Spanish territory and natural ports or ports built with public funds for the general service, unlike those built for the exclusive service of the State, which belong to the private ownership of the latter." (Italics ours.)

Further on the Commission states in its Statement of Motives:

"By public ownership of the Nation it should be understood that belonging to the latter with respect to those things whose use is common because of their very nature or the purpose to which they are devoted; such as, for example, *seashores, rivers,* roads, public piers and ports; its *principal characteristic being* that it is not subject to *conveyance or prescription.* And by private ownership of the State it is understood that belonging to the latter with respect to those things which are destined to its service, that is, to satisfy its collective necessities, *and not for the common use,* things of which it disposes as the individuals do with respect to those constituting their patrimony: such as, among many others, *forests,* mines, arsenals, fortresses, and military buildings." (Italics ours.)

Even more applicable to the litigious question raised by the Commonwealth in the case at bar, the Statement of Motives states:

"In declaring also the seashores as public ownership of the Nation, it has been deemed convenient to reestablish the provi-

sions of our old laws which in accordance with the Roman laws, had fixed as boundaries of the shores the area where sea waves reach in ordinary stormy weather, *sufficient space for the necessities* of navigation and fishing, and instead of the contiguous zone of *20 varas*, which later has been considered as an enlargement of the shores, the *salvage and police servitudes* are established over the boundary tenements with which navigation interests in cases of shipwreck, and those of Public Finance for the surveillance of the coasts are *sufficiently* protected without having to *condemn to perpetual sterility* lands which in some regions are subject to cultivation." (Italics ours.)

Pursuant to this legislation, it suffices to see ANNEX-A, which is also evidence of the appellant Commonwealth, in order to grasp the impossibility that Parcel No. 10, as demarcated in said Official Plan of 1919, could be a *seashore* under any view of that Law. We already said that the Puerto Nuevo River is not navigable. In the scale in which said Official Plan was made, 1:5,000, the part nearest to the sea of Parcel No. 10, which is its north and west, is some 1,400 meters away from the seashore, that is, almost a kilometer and a half, compared with the strip of some meters of land washed by the sea in the ebb and flow of the tide in ordinary stormy weather, or the line of the highest or equinoctial tide.

■ Under the concept of *"forests"*, Parcel No. 10 could have been a property of the State, but it is clear that the law itself and its Statement of Motives *exclude* forests from those properties which, because of their nature and use, are not subject to alienation by the Government, or of being *owned* and prescribed by a particular person. To this respect, affirming the foregoing, Art. 26 of the Law of Waters of 1866 provided:

"The Government shall *grant* the *marshes* belonging to the State or of common use of towns, for their drainage, when, after hearing the Commander of the Navy, the provincial Head of Civil Engineers, the Governor of the province, and the consultant Board of Public Works at the Ministry, it is established that it

will not result in prejudice to the navigation of rivers or the conservation of ports.

"The *marshes* of *private ownership* may be drained by *their owners* with permission of the Governor of the province. . . ." (Italics ours.)

■ *Marshes*, which, as we shall point out later, are considered as *"forests"* have been defined as low and swampy lands flooded by the seawaters; and Alcubilla, Vol. 7, p. 133, upon referring to the same, states that they are low lands contiguous to the seashores or riverbanks which are flooded by the overflowing waters of the seas and rivers; and that the Law of 1866 provided the *concession* by the State for the drainage of the marshes which belonged to it, and the rules for the drainage of those of *private ownership*.

By Judgment of the Supreme Court of Spain of January 28, 1878, in which a grantee of lands which were *marshes* sued another individual in order that the latter would leave them at his disposal, and the defendant invoked being the owner of the same pursuant to documents which dated from the XVII Century, said Court reversed the judgment on appeal which declared that said *marshes* were of public ownership until the date of the grant in favor of plaintiff. The Supreme Court said that the judgment appealed from violated the Judgment of December 19, 1870, and Art. 26 of the Law of August 3, 1866 (Law of Waters) in declaring that *"seashore"* and *"marshes"* are the same thing. Copied at 7 Alcubilla, *op. cit.* at p. 135.

Insofar as the boundary of the Puerto Nuevo River is concerned, the Law provided in its Art. 72 that the natural beds and channels of rivers were of public ownership; and in Art. 73 that "by riverbanks it is understood the lateral strips or zones of their bed which are *only* washed by the waters during risings which do not cause floods. The *private ownership of the banks* is subject to the servitude of *three*

meters of the zone *for public use,* in the general interest of navigation, flotation, fishing, and salvage." (Italics ours.)

Finally, if there were conflict between the right of the Ramos and the right of the State as a result of the provisions of the Law of Waters of 1866, and insofar as pertinent, we do not see any conflict, in its General Provisions the same provided, Art. 299: "All the provisions of this law are *without prejudice* to rights legally acquired prior to its publication, or to the private ownership vested in the owners of the waters of ditches, . . . ." (Italics ours.)

The Statement of Motives expresses about this Art. 299: "The law ends with two general provisions; by the first [Art. 299] grounded on the known principle that laws should not have retroactive effect, it is declared that all the provisions of the same are *without prejudice* to the rights acquired prior to its publication." (Italics ours.)

The Law of Waters of 1866 was in effect in Puerto Rico until February 5, 1886, when by Royal Order the Law of Waters of June 13, 1879, and the Harbor Law of May 7, 1880 were extended to the Island. The Law of Waters of 1879 substituted the 1866 one only as to terrestrial waters, with few modifications and is not involved with the present action. As to maritime waters, it was substituted by the Harbor Law of 1880, which began to rule here, as we have stated, in 1886.

Alcubilla comments, *op. cit.* at p. 341, that with the Law of Waters of 1879 and the Harbor Law of 1880, the Statement of Motives of the 1866 Law did not lose in any manner its importance or effectiveness.

The Harbor Law of 1880, as extended to Puerto Rico, provided in its Art. 1 that the following "is national property for public use without prejudice to the rights of private individuals:

"1. The maritime-terrestrial zone, which is the area of the coasts or seashore of the Island of Puerto Rico and its adjacent islands which are part of the Spanish territory, *and which is*

*washed by the sea* in its ebb and flow, where the tide is perceptible, or the highest tidal waves in stormy weather when the tide is not perceptible.

"This maritime-terrestrial zone is also extended to the margins of the rivers up to the place where they are navigable or where the tides are perceptible." (Italics ours.)

This Law reproduces almost all the provisions about public ownership of maritime zone contained in the 1866 Law and expressly provides that: (Art. 1, subsections 7, 8, and 9)

"7. The lands of *private ownership* adjacent to the sea *or situate in the* maritime-terrestrial *zone* are subject to the servitude of salvage and police of the littoral.

"8. The salvage servitudes have the same extension in *privately owned lands* adjacent to the sea, *as the maritime-terrestrial zone, within which they are comprised* and 20 meters more inland and they shall be of public use in shipwreck cases, to salvage and deposit the remains, effects, and cargo of the shipwrecked vessels.

. . . . . . . . .

"This servitude zone shall advance or retreat as the sea advances or retreats, as it is generally established for maritime-terrestrial zones.

"For damages caused to properties in cases of salvage *compensation* is justified, . . . .

"9. The salvage servitude does not prevent the owners of the lands adjacent to the sea from cultivating, planting, and raising *within the maritime-terrestrial zone, in their own lands,* agricultural buildings and country houses." (Italics ours.) (Law of Harbors, 1880, *Compilación de los Estatutos Revisados y Códigos de Puerto Rico* 92, 1941 ed.)

Appellant, the Commonwealth, relies on this legislation to support basically its proprietary right. The fact deserves some observations:

i. We said before that it was impossible that Parcel No. 10 were a *seashore* under the 1866 Law and the Official Plan, and that the waves reached there, a kilometer and a half away.

ii. The 1880 Law above-copied introduces the concept of *"maritime-terrestrial* zone" and describes it as that area washed

by the sea in its ebb and flow, and extends it to where the tide is *perceptible* or the highest tidal waves in stormy weather when the tide is not perceptible.

iii. Assuming—the State did not present evidence about the fact—that Parcel No. 10 was an area where the tides were perceptible and that when the tides changed seawaters covered it, that is, that Parcel No. 10 was a *marsh*,[10] the above-copied provisions of this Law of 1880, still in effect, as those of the Law of 1866, recognize fully the enjoyment of private property in this kind of "maritime-terrestrial" zone, different from defendant's view that they are properties which cannot be alienated by the State, or privately *owned*.

iv. Even though the foregoing were not correct, this "maritime-terrestrial" zone, in the manner defined, to the area where the tides are perceptible, was established for the first time on February 5, 1886, years after Ramos had his property title recorded in the Registry. Consequently, all of Ramos' successors in title, as are the plaintiffs in this action, have the unquestionable protection of Art. 34 of the Mortgage Law of 1883, as third parties who acquired from whom, according to the Registry, could transmit. Hereinafter we will refer in more detail to the problem of the third-party mortgagee.[11]

v. Finally, just as the Law of 1866 which protected the rights already acquired and to which it was not sought to give retroactive effect (Art. 299) the Law of 1880, in declaring public ownership immediately states that it is, "without prejudice to

---

[10] The Minutes of the findings of the trial judge's Ocular Inspection tends to indicate the opposite.

[11] Article 33 of the Mortgage Law of May 26, 1893 provides that:

"Instruments or contracts which are null under the law are not validated by their admission to record."
And Art. 34:

"*Notwithstanding the provisions of the foregoing section*, instruments or contracts executed or entered into by a person who, according to the registry, has a right to do so, *shall not be invalidated with regard to third persons* after they have been recorded, even though the interest of such party should subsequently *be annulled or terminated* by virtue of a prior deed which was not recorded or for reasons which do not clearly appear from said registry." (Italics ours.)

Articles 33 and 34 of the Spanish Mortgage Law which ruled in Puerto Rico since May 1, 1880, until this Law of 1893, provided likewise.

the rights which may belong to individuals," and respects, as the former, those already acquired.

The Commonwealth, in support of its thesis, presented the Administrative Record No. 175 of July 1, 1895 (Defendant's Exh. L) in which Leopoldo Cerecedo, who acquired San Patricio in 1893—*supra*, paragraph 2—and predecessor in title of plaintiffs, presented a petition to the General Governor requesting him to stop the cutting of mangrove which was being done in his Hacienda San Patricio by personnel of the works of the port causing damage to his property.

The complaint having been received, the cutting of mangroves was immediately stopped and transferred to another place "in the left margin of the Puerto Nuevo Channel, . . . until the real zone is demarcated where the extraction should be made."

The issue having been referred by the Board of Harbor Works of the Capital to the Assistant in charge of the works, there is a report of August 6, 1895 addressed to the Chief Engineer, Director of the Works. The report states that Cerecedo seemed to commit an error in appraisal "mistaking the boundaries of his property with those of the maritime-terrestrial zone." In order to "be able to dissipate such errors" it delved into questions about the mangrove plant and where it grows. It states:

"The red mangrove, a tree whose wood is used as kindling for the movement of the steam engines of the Cleansing Train in the service of the Harbor Works is a special plant which grows only in *marshes*, that is, on the miry land which is washed by sea waters in its ebb and flow. . . . Because of the special environment in which this plant lives, it cannot grow on any land other than saltpetrous land washed by the sea in its ebb and flow, occupying, therefore, the maritime-terrestrial zone of the low shores of this Island. The boundary of a mangrove swamp, that is, its meeting with the Coast vegetation, *is determined precisely by nature itself*, since another special plant which is named *'marungüey'* and which needs for its nutrition the salt-

·petrous and vegetable land washed by rainfall *develops and grows* in the union of both zones so that the least prudent *can easily become aware of the boundary* of the maritime-terrestrial zone occupied by the mangrove swamps in ' a certain place by *noticing only where* the said *'marungüey' plant begins to grow* which, as has been stated, bounds the vegetable land from the saltpetrous or *marshes* of the coast." (Italics ours.)

We interrupt here the report to point out that from the Minutes of the Ocular Inspection which the trial court performed, beginning in the north and west boundary of Parcel No. 10, the trial judge stated that walking towards the east, along the north boundary, he observed mangroves in the *left* bank of a canal, probably the old bed of the Puerto Nuevo river before the latter was deviated to empty in the Caño Martín Peña, and in the right side, or towards the south, he observed lands covered with natural pasture, *"marungüey"* and shrubs of different species including mangroves and other species.

The aforesaid report concluded that the cutting was being done in the mangrove zone, *without having entered into the area of "San Patricio" for anything,* and that the complaint seemed to be groundless. The magistrate recommended to have a demarcation done of the expressed zones "fixing at the same time the boundaries within which the *mangrove land which may be exploited for the aforementioned uses* is com-·prised." (Italics ours.)

The report of July 18, 1895, of the Chief Engineer to the Chairman of the Board of Harbor Works of the Capital, states that the cutting of mangrove had always been done within the places detailed in the auction in which the use of the mangroves of the State, located in Bayamón were awarded to the Board of Harbor Works, without going beyond, in any case, the part adjacent to Cerecedo's boundaries, the higher boundary of the maritime-terrestrial zone "where the special plant called *'marungüey'* grows."

The report accepts that it was *"undeniable* as appellant says and it is known by all, *that within the maritime-terrestrial zone private properties* may exist," (italics ours) but that plaintiff had not shown any document to prove that San Patricio was, entirely or partially, comprised within said zone. This second report insists that the only way to settle the conflict in a radical way was by performing "the demarcation of the zone *where* the exploitation of lumber, for the referred uses, *may be carried out."* (Italics ours.)

■ The former Administrative Report contemporaneous with the adoption of the Harbor Law of 1880, does not support appellant's theory that the marshes, assuming that Parcel No. 10 were one, are properties not subject to alienation or private ownership. It also discredits the conclusion that the mangroves, just because they are mangroves, are necessarily property of the State, and does not prove that the Spanish Government was the owner of Parcel No. 10, which was later transferred to the United States under the Treaty of Paris and under the Foraker Act to the People of Puerto Rico as properties "to be administered" for the benefit of the People.[12]

The Proclamation of the Governor of Puerto Rico of May 28, 1918, Administrative Bulletin No. 143, was issued under the authority of § 2 of Act No. 22 of November 22, 1917, creating a forest service. This act authorized the Governor "after a *public hearing of the interested parties,"* (italics ours) to set apart, from time to time, as Insular Forests, any Insular public land, and after *hearings* the Governor could revoke, modify or suspend any proclamations or part thereof. (Section 2.)

---

[12] However, the fact that the Act of Congress of July 1, 1902, granted Puerto Rico the ownership of those properties which the United States acquired from Spain which were not reserved by the President by virtue of said Act, the Organic Act of 1917 repeated again that they were "to be administered" for the benefit of The People of Puerto Rico; and it has been thus perpetuated in the actual Federal Relations Act.

Among the powers granted by this act to the Commissioner of Agriculture, there is that of leasing or otherwise granting the occupancy and use of these forests of the State. He is also empowered to adopt regulations concerning the use, etc. and occupancy of the same, but he was imposed the obligation to grant a *hearing* to any person who deemed himself aggrieved.

The survey and demarcation of any insular forest was ordered, including granted lands or lands belonging to the Spanish Crown included in any insular forest before perfecting the survey and title thereof, provided that nothing contained in this provision would be held "to in any way interfere or conflict with any *vested right* under or arising out of any grant or grants . . . of . . . any government. . . ." (Italics ours.)

■ The Proclamation of 1918 does not declare that all the mangroves are Government property, but declared the mangroves belonging to the People of Puerto Rico insular forests. In the description and demarcation of the one involved herein, in the Proclamation it is stated that it is bounded on the east by other mangroves. If it would have been sought to establish that all the mangroves were public property, the east boundary would have to be firm vegetable land. From which it is inferred that the drawing of the Official Plan of 1919, as a question of law, is not consistent with the Proclamation or Act No. 22 of 1917, nor the Spanish Legislation in effect here concerning the ownership of the maritime-terrestrial zone. Appellant has not presented proof of the survey certificate of the Plan of 1919, from where it could be inferred that the interested parties and adjacent owners were heard, as required by the aforementioned Act No. 22.

■ In *The People* v. *Dimas, supra,* we said at p. 1029 that the mangrove marshes were considered as "forests" reservations, even though they constitute tide lands. See

General Ordinances of December 22, 1833 describing the "forests". 6 Scaevola, *op. cit.* at p. 143 (1891).

The Royal Decree of April 21, 1876, provided for the demarcation and conservation of the forests and lands of the Crown existing in Cuba and Puerto Rico, and Forest Regulations were approved. In its Art. 1 it was stated that the word "forests" includes "all lands destined particularly for the production of timber and firewood, and lands of uncultivated pasture."

The forests were divided into (1) public forests and (2) private forests, the latter being defined as "those of private ownership under a valid title." The demarcation of public and private forests was ordered as provided, and it was provided that the Engineer Inspector of Forests should present to the Governor General two lists of public forests: (1) Those which, because they are high, were necessary for war and navy services, should not be sold and (2) those forests which, without impairing public interest, *might become* the property of private individuals. 116 *Colección Legislativa de España* 360. These lists were actually made and existed as it is inferred from appellant's evidence. Reference to those lists and inventories is made in *People* v. *Rojas, supra* at pp. 119–121.

This Court at p. 1035 of *People* v. *Dimas,* in the aforecited vol. 18 of Puerto Rico Reports, refers to *proceedings* instituted for *auctioning concessions* for the use of several forest reserves, where the Governor issued an order instructing the mayoralty to post advertisements for public auctions of concessions for cutting firewood from the government forest reserve known as "Manglar" situated on the northern shore of the bay. Again, now judicially, there is an additional expression which does not agree with the theory that mangroves, or *marshes* of the maritime-terrestrial zone, are, *just because they are mangroves,* property of public domain and use of those that because of their nature are

beyond the scope of trade between men and cannot be alienated by the State and are not subject to private ownership by the recognized means of obtaining title, including possession. Our Legislative Assembly also recognized it thus when it approved Joint Resolution No. 7 of May 13, 1927, which authorized the Commissioner of the Interior to *sell mangrove swamp lands* of the People of Puerto Rico.

The common Spanish legislation, contemporaneous with the special legislation of Waters and Harbors does not support appellant's position either. The Spanish Civil Code of May 26, 1889, in effect in Puerto Rico on January 1, 1890, and until July 1, 1902, provided in its Art. 339 that property of public ownership is: "That destined to the public use, such as 'roads, canals, rivers, torrents, ports, and bridges constructed by the State, and banks, shores, roadsteads, and that of a similar character.' " Neither mangroves nor marshes are mentioned as such. Article 344: "Property for public *use* in provinces and in towns comprises the provincial and town roads, the squares, streets, fountains, and public waters, the promenades, and public works of general service supported by the said towns or provinces.

"All other property possessed by either is patrimonial, and shall be governed by the provisions of this code, unless otherwise prescribed in special laws."

Article 407 which deals with the public ownership of waters does not include the property in litigation, even though the same would be a mangrove.

In the absence of proof of the Commonwealth to challenge the recorded title of Antonio Ramos, his possession with valid notarial title since 1815, or to destroy plaintiffs' condition of third-party mortgagee there is no ground to alter the judgment appealed from under the view that Parcel No. 10, even though it would partake of the nature of mangrove or marsh land—and the trial court concluded otherwise

—it is a property of public use not subject to alienation or grant by the State, or private ownership.

Perhaps the foregoing is sufficient to dispose of this petition for review. But as it involves properties which today have an immense economical value, we prefer, however, not to exclude from the analysis anything that may reaffirm the judge's conviction, even if we have to prolong more this exposition.

*The People of Puerto Rico*

v.

*Luis Llorens Torres, Civil*
*12,685, Revendication*

With more vigor and persuasive force for the decision of this case than the foregoing interpretative analysis are the facts which were legally perpetuated in the lawsuit for revendication prosecuted by the People of Puerto Rico against Luis Llorens Torres in the then District Court of San Juan.

On April 16, 1920, the Government filed an action of revendication claiming the dominion of a parcel of 300 cuerdas which it alleged Llorens wrongfully occupied without any title. It obtained immediately an *injunction pendente lite* on the ground that Llorens not only cut firewood but that he also plowed and cultivated untilled grounds.

The parcel was described as part of a mangrove of 1,003.61 cuerdas, declared insular forest by the Proclamation of May 28, 1918, "the same bounded on the North by waters of the Puerto Nuevo river; on the East by waters of the same river and the Hacienda San Patricio; on the South by the Hacienda San Patricio, owned today by Luis Rubert, with lands of the Heirs of Ramos, before, today of Luis Llorens Torres; and lands of Eduardo González Caneja, before, today of Eduardo and Celestino Iriarte, and on the West by more mangrove lands of the People of Puerto Rico."

Despite the fact that the mangrove land of 1,003.61 cuerdas had been already demarcated in the Official Plan of 1919 by points, angles, directions, and distance, and divided into parcels identified with the numbers 9, 10, 11, 12, the geometric description of this parcel of 300 cuerdas was not given in the complaint, nor was it situated in any of the said numbered parcels.

Llorens denied the complaint, and alleged that he was the owner of the Monterrey property which he described in the same manner as he had it recorded according to the demarcation he made with Rubert (see foregoing paragraph 6), except that he alleged that he had 397 cuerdas instead of 220.

This greater area motivated a stipulation of the parties filed on August 5, 1924, where they agreed that from the Monterrey property of 397 cuerdas described in Llorens' answer, the People only claimed 300 *miry* cuerdas and that 97 cuerdas *located in the dry part*, that is, the southern part, were left out of the litigation. They described these 97 cuerdas as bounded on "the North, by miry lands claimed by the People of Puerto Rico; on the East, *by the Barraco Brook which separates lands of Luis Rubert;* on the South, by the aforesaid lands of Rubert and . . . , and on the West by said miry lands which the People of Puerto Rico claims." (Italics ours.)

It should be noted that now the Barraco Brook, western boundary of Rubert and of Parcel No. 10, is identified as eastern boundary of the *dry* land which is eliminated from the lawsuit.

On March 5, 1925, Judge Charles E. Foote rendered judgment against Llorens and ordered the revendication. Fundamentally, Judge Foote based his decision on what he observed in the ocular inspection, and said: "the Northern boundary of defendant's property is the Puerto Nuevo River, *only as far as the point* where it flows into the San Juan Bay, *and from there on* the boundary is the mangrove zone

which we have described before, [he refers to the mangrove land of 1,003.61 cuerdas] and within which the portion of land claimed by the plaintiff is included, the dividing line being the highest line marked by the waters of the rising and receding tide." (Italics ours.)

If it is considered that since its origin the part nearest to the sea of the San Patricio property, or its Western boundary, never surpassed the Margarita Brook, and according to ANNEX-B the point where it flows into the river appears at 150 meters from the shore, the observations of Judge Foote were not wrong.

Llorens appealed. We did not decide the case because the parties stipulated its solution. In a compromise which they submitted to the District Court, dated February 12, 1931, The People of Puerto Rico accepted that Llorens was a *third-party mortgagee* protected by the Registry as to the not increased area of 220, "whose chain of title has been verified since 1815"; and requested that judgment be entered decreeing that Llorens was the legitimate owner of those 220 cuerdas recorded in the Registry which were described anew in the same manner stated in the preceding paragraph 6 in this opinion.

Defendant Llorens, on his part, agreed to the decree that the People of Puerto Rico was the legitimate owner "of all the excess land situated between the 220 cuerdas described above and the San Juan Bay, the defendant being under the obligation to deliver the possession of said land to the plaintiff, the People of Puerto Rico."

The parties also stipulated that the 220 cuerdas "shall be comprised from *Verraco* [*sic*] *Brook* which separates defendant's property from Hacienda San Patricio of Luis Rubert, *up to a straight line parallel* to the highway, to be laid out *from Margarita Brook* as far as the Puerto Nuevo River; and that *from this line,* which shall be drawn by engineers of the Department of the Interior, the remaining land, *as far as the San Juan Bay,* shall become the property of the People of Puerto Rico.

After said line is laid out, the parties *are bound* to respect it as dividing line between both properties, waiving any further rectification or marking of boundaries between them or their successors in interest; and consequently, the People of Puerto Rico waives *any right or claim concerning any* other lands claimed in this lawsuit and owned by Llorens which are located to the *east* of the aforesaid line parallel to the highway, which shall be drawn by engineers of the Department of the Interior and which shall serve as boundary hereinafter between the lands of the People of Puerto Rico *and those of the old Hacienda San Patricio, named today San Patricio and Monte Rey.*" (Italics ours.)

The aforesaid highway is Highway No. 2, which, as it may be seen in ANNEX-A, is considerably nearer to the sea towards the west than Parcel No. 10. However, the evidence shows that the People of Puerto Rico paid Ramos, in 1913, the price of the land occupied by this highway.

In conformance with the foregoing stipulation, the District Court of San Juan rendered final and unappealable judgment on February 18, 1931, judicially perpetuating the agreements and statements made by the parties.

The action of revendication ended actually, as one for demarcation of boundaries, in which the Government acknowledged the Margarita Brook as the west boundary of the Hacienda San Patricio, as it was acquired in 1815, and the Barraco Brook as the west boundary of said property after it was divided between Llorens' Monte Rey, and Rubert's San Patricio. (The foregoing paragraph 6.)

Even though Rubert could have been indirectly affected by the resultances of Llorens' lawsuit—as a matter of fact he contributed to bear the expense of the same—the aforementioned judgment is not res judicata herein, since Rubert was not an appearing party.

The People's acceptance that Llorens was a third party protected by the Registry insofar as his 220 recorded cuerdas are concerned was well and correctly done. Llorens was unquestionably protected as third party in those 220 recorded

cuerdas—Art. 34 of the Mortgage Law—although not as to the additional 197 cuerdas he alleged upon answering the complaint.

█ A fortiori, plaintiffs are also third-party mortgagees as to their recorded area since their chain of title, as that of Llorens, has identical origin and comes from the same property No. 89 recorded in January 1882.[13]

The judgment of demarcation of boundaries of 1931 was accepted by the Government. The Official Plan of Mangrove Lands of 1919 was modified in order to draw on it the demarcation of boundaries agreed upon and ordered, and in said Plan the dentate line (///////) was drawn, to the east of which the Government admitted not having any claim, and that it would be the perpetual dividing line between the lands of the State and those of the "old Hacienda San Patricio."

Transferring this fact to ANNEX-A, it will be noted that this boundary line is located at 825 meters to the west of the Barraco Brook, that is, that the west boundary of Parcel No. 10, the one nearest to the sea, is almost one kilometer to the east of said dividing line, to the east of which the Government accepted not having any proprietary rights.

---

[13] In *The People* v. *Dimas, supra,* we said at page 1032 that the People's complaint for revendication had been dismissed as to the defendants, Bosch and Riera, "the court being of the opinion that they were entitled to the privileges of innocent third parties, as alleged by them." In this case mangrove lands were involved and the Government did not appeal from the pronouncement of the trial judge declaring Bosch and Riera third-party mortgagees.

This Court continued then considering whether or not the other defendants against whom the complaint for revendication was granted were third parties, and we concluded that they were not. 18 P.R.R. 1032 (1912). It was not only in the case of Llorens that the People recognized that third-party mortgagees protected by the Registry may exist even though this kind of maritime-terrestrial zones, mangrove lands, might be involved. *Cf. Fajardo Sugar Growers Ass'n* v. *Kramer,* 45 P.R.R. 337 (1933), where at page 366 we discussed whether there was a condition of third party and we concluded that there was none because from the Registry a subsequent purchaser had been clearly informed that an original grantee had not fulfilled the conditions imposed to acquire title.

After those facts we cannot understand how in 1940, ten years later, and with the Official Plan of 1919 already modified in conformance with the judgment of 1931, the Commissioner of the Interior could have certified to the Registrar the first entry of Parcel No. 10 in favor of the People of Puerto Rico, as a property obtained from the Spanish Crown through the Treaty of Paris, § 13 of the Foraker Act, and the Act of Congress of July 1, 1902.

In the study of this case we have had the benefit of the excellent work performed by Judge Polo, magistrate who rendered judgment in first instance. His judgment, which granted the complaint of revendication and ordered the cancellation in the Registry of Property of the entry in favor of appellant, the Commonwealth of Puerto Rico, of Parcel No. 10 which at the present time is composed of a property of 6.896 cuerdas and another of 120.48 cuerdas after the segregation in favor of the United States which is not in litigation, will be affirmed.